ROBINSON + COLE LLP
666 Third Avenue, 20th Floor
New York, New York 10017
212-451-2900 (phone)
212-451-2999 (facsimile)

*Counsel to Heather Barlow in her capacity as Trustee of the Endo Mesh Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ENDO INTERNATIONAL, plc, *et al*.[1], | Case No. 22-22549 (DSJ) |
| Debtors | |
| JODIE PHILIPSEN and JANICE SEYMOUR On Behalf of Themselves and All Other Similarly Situated Australian Mesh Claimants, | |
| Plaintiffs, | Adv. Pro. No. 26-07068 |
| -against- | |
| HEATHER BARLOW, as Trustee for the Mesh Trust, U.S. BANK TRUST NATIONAL ASSOCIATION as the Delaware Trustee for the Mesh Trust, and the ENDO MESH TRUST[2] | |

[1] The last four digits of Debtor Endo International plc's tax identification number are 3755. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1400 Atwater Drive, Malvern, PA 19355.

[2] Capitalized terms used in the following paragraph and the Introduction and not otherwise defined shall have the meanings ascribed to them in the Endo Mesh Trust Agreement, if defined therein, or as defined *infra*.

The caption reflects the caption of the Amended Complaint filed by Movants on June 12, 2026. Ms. Barlow, in her capacity as Mesh Trustee, was named in the Original Complaint. After being advised that pursuant to the Mesh Trust Agreement that it is the Mesh Trust and not the Mesh Trustee who is to be named, the Amended Complaint was filed. A revised version of the PI Motion was not filed.

**OBJECTION TO THE MOTION OF JODIE PHILIPSEN AND JANICE SEYMOUR FOR A PRELIMINARY INJUNCTION, FOR ENTRY OF AN ORDER SCHEDULING A HEARING, AND FOR A TRO ON NOTICE PENDING THE HEARING**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ... iii

INTRODUCTION ... 1

FACTUAL BACKGROUND ... 3

I. The Endo Debtors' Bankruptcy Cases ... 3

II. The Mesh Trust ... 3

III. The Mesh Claims Process and Mesh Claim Submission Form ... 4

IV. The Mesh Trustee's Powers and Discretion Under the Mesh Trust Agreement ... 5

V. The Movants Have Been Represented by Counsel Since the Outset of These Cases ... 6

VI. The Movants' Failure to Take Timely Action to Satisfy or Seek to Modify the Requirements of the Mesh Trust Enforcing the Mesh Claims Process ... 7

VII. Movants Sought and Withdrew a Request for Class Certification with Prejudice ... 10

VIII. The Complaint and the Amended Complaint ... 10

ARGUMENT ... 11

The Movants Fail to Satisfy the Requirements for Entry of a Preliminary Injunction ... 11

A. The Movants Cannot Demonstrate Irreparable Harm. ... 12

B. The Movants Cannot Demonstrate a Likelihood of Success on the Merits ... 14

1. Procedural Deficiencies Prevent Prosecution of the Amended Complaint ... 14

2. The Movants Fail to Assert a Legally Sufficient Basis for Retroactive Reinstatement of Their Disallowed Claims ... 16

a. The Movants' Claims Were Disallowed by the Self-Executing Terms of the Mesh Trust Agreement When They Elected to not Provide a HIPAA Release in Response to a Deficiency Notice ... 16

b. The Terms of the Mesh Trust Agreement are not Ambiguous ... 18

c. Movants' Arguments Regarding the Applicability a HIPAA Release to Australian Claimants Are Irrelevant and Would Result in the Mesh Trust Having no Evidence of Individual Consent by Claimants to Receipt, Review, and Verification of Their Private Medical Records ... 19

d. The Movants Unreasonably Failed to Take Timely Action to Satisfy or Challenge the Mesh Trust's Requirements Despite Early and Repeat Notice of the Mesh Trust's Position Requiring an Executed <u>HIPAA Release</u> ... 21

C. In Balancing Relative Hardship of the Parties, the Mesh Claimants Who Timely Complied with the Mesh Claims Process and the Mesh Trust

Would Suffer Significant Hardship by Granting the PI Motion, Whereas any Possible Hardship to the Movants Occurred Long Ago ................................ 22

D. Public Interest Requires Denial of the PI Motion 23

CONCLUSION........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. CovCare, Inc.*,
No. 21-CV-01644 (DG) (JRC), 2021 WL 7162292 (E.D.N.Y. Apr. 7, 2021) ..................11, 13

*In re Au Coton, Inc.*,
171 B.R. 16 (S.D.N.Y. 1994)..................17, 18

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)..................12

*Chase Manhattan Bank, N.A.. v. Celotex Corp.*,
56 F.3d 343 (2d Cir. 1995)..................15, 16

*Emerson Radio Corp. v. Orion Sales, Inc.*,
*253 F.3d 159* (3d Cir. 2001) ..................18

*In re Enron Corp.*,
419 F.3d 115 (2d Cir. 2005)..................17

*Fiberlink Communications Corporation v. Digital Island, Inc.*,
No. 01-2666, 2002 WL 1608235 (E.D. Pa. July 18, 2002) ..................18

*In re Homaidan v. Sallie Mae, Inc. (In re Homaidan)*,
650 B.R. 372 (Bankr. E.D.N.Y. 2022)..................12, 13, 14

*Home It, Inc. v. Wen*,
No. 19-CV-7070 (MKB) (VMS), 2020 WL 353098 (E.D.N.Y. Jan. 21, 2020)..................13

*ICICI Bank Ltd., .N.Y. Branch v. Doshi*,
No. 19-CV-11788-LTS-SLC, 2024 WL 1242531 (S.D.N.Y. Mar. 22, 2024)..................15

*In re Lehman Bros. Holdings Inc.*,
566 B.R. 353 (S.D.N.Y. 2017)..................17

*Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*,
103 F. Supp. 3d 244 (N.D.N.Y. 2015)..................13

*Mohamad v. Rajoub*,
767 F. App'x 91 (2d Cir. 2019)..................15

*NAACP v. Town of East Haven*,
70 F.3d 219 (2d Cir. 1995)..................12

*New Castle Cnty v. Nat'l Union Fire Inc. Co. of Pittsburgh, Pa.*,
174 F.3d. 338 (3d Cir. 1999)....................18, 19

*Roman Catholic Diocese of Syracuse, N.Y. v. LG 35 Doe* (*In re Roman Catholic Diocese of Syracuse, N.Y.*),
628 B.R. 571 (Bankr. N.D.N.Y. 2021) ....................14

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)....................12, 14

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
322 F.3d 115 (2d Cir. 2003)....................19

*In re Trump Taj Mahal Assoc.*,
156 B.R. 928 (Bankr. D. N.J. 1993) ....................17

*Vega v. State Univ. of N.Y. Bd. of Trs.*,
67 F. Supp. 2d 324 (S.D.N.Y. 1999)....................16

*In re W.R. Grace & Co.*,
563 B.R. 150 (Bankr. D. Del. 2016) ....................17

*W.R. Grace & Co v Chakarian (In re W.R. Grace & Co.)*,
386 B.R. 17 (Bankr. D. De. 2008) ....................22, 23

*In re XO Commc'ns, Inc.*,
301 B.R. 782 (Bankr. S.D.N.Y. 2003)....................17

**Statutes**

Fed. R. of Civ. Proc. 65 ....................2

**Secondary Sources**

https://journal.ahima.org/Portals/0/archives/AHIMA%20files/Long%20Distance%20Records_%20Requesting%20and%20Managing%20the%20Records%20of%20Foreign%20Nationals.pdf ....................19

Heather Barlow (the "Mesh Trustee"), solely in her capacity as the trustee of the Endo Mesh Trust (the "Mesh Trust"), hereby submits this opposition (the "Objection") of the Mesh Trust to the Motion of Jodie Philipsen and Janice Seymour (collectively, the "Movants") for a Preliminary Injunction, for Entry of an Order Scheduling a Hearing, and for a TRO on Notice Pending the Hearing [Adv. D.I. 2] (the "PI Motion").

## INTRODUCTION

On March 21, 2025, the Movants' claims were "deemed to be Disallowed for all purposes by the Mesh Trust" under the explicit, self-executing terms of section 4.1(e) of the Endo Mesh Trust Agreement (the "Mesh Trust Agreement"). Because Movants do not hold viable claims against the Mesh Trust, they cannot establish any of the four prongs for granting a preliminary injunction required to obtain the injunctive relief they seek, including likelihood of success on the merits or irreparable harm.

The Movants elected to ignore multiple communications from the Mesh Trust advising of the need to submit all required information to have their claims resolved consistent with the terms of the Endo Mesh Trust Agreement.[3] Specifically, they failed to submit a HIPAA Release as part of their claim submissions and, given the opportunity to cure that deficiency, elected to ignore the explicit notice. In addition to the notices received and the unequivocal language of the Mesh Trust Agreement deeming claims disallowed for failing to cure in response to a deficiency notice, Movants were explicitly informed by the Mesh Trust on March 19, 2025 that their claims would be disallowed if they failed to submit a HIPAA Release.

[3] The form of HIPAA Release required by the Mesh Trust is attached as Exhibit 3 to the Trust Submission Form for Mesh Claims Process, attached to Exhibit 1, the Declaration of Natalie D. Ramsey (the "Ramsey Dec.") as Exhibit A.

Inexplicably, Movants sat for fifteen (15) months before filing their Original Complaint. The Movants now ask this Court to grant retroactive relief relieving them from the requirement to provide a HIPAA Release.

The Mesh Trust conducted an orderly and fair claims process over a period of almost two years. Since the deadline for submission of Mesh Claims, the Mesh Trust has been engaged in analyzing the claims that satisfied the requirements of the Mesh Trust Claims Process ("Claims Process") and the Mesh Trust Agreement. Rule 65 of the Federal Rules of Civil Procedure does not permit litigants to create an emergency through prolonged inaction. The Movants' delay alone is sufficient to deny the PI Motion.

Further, Movants ignore the procedural requirements established by the Mesh Trust Agreement requiring any challenges by an Eligible Mesh Claimant to be pursued individually and instead frame their joint action as also "brought on behalf of themselves and all other similarly situated Australian Mesh Claimants."[4] The procedural deficiencies require dismissal of the action, and also demonstrate that they cannot demonstrate a likelihood of success on the merits.

---

[4] The Movants seek relief individually and on behalf of "all other similarly situated Australian Mesh Claimants." In addition to violating the requirements of Section 4.8.1 of the Mesh Trust Agreement by purportedly bringing the action on behalf of multiple claimants, the Movants have no proper legal authority to pursue this action as a class action and have not been qualified as class representatives. Not only have the Movants failed to take the legal steps necessary to act on behalf of any such class, their prior withdrawal with prejudice of a motion seeking class certification bars them from doing so now. *See* discussion *infra* at Argument I.B.1.

Movants misleadingly state that there are approximately 6,000 claimants who are similarly situated. Movants are wrong. Almost 2,000 of the claimants on whose behalf Movants seek to act failed to provide proper medical documentation or satisfy other trust requirements separate from providing a HIPAA Release. Those claims cannot be resurrected through this adversary.

For purposes of this Objection, without waiver, and expressly preserving all challenges to the procedural defects of this adversary, the use of the term Movants herein refers to the two individuals named and to all individuals who they purport to represent whose claims were Disallowed by the Mesh Trust based solely on the failure to provide an executed HIPAA Release.

The relief sought in the PI Motion fails to satisfy a single requirement entitling the Movants to the extraordinary relief of a preliminary injunction. The PI Motion should be denied and the order temporarily restraining the Mesh Trust from making distributions to holders of Mesh Claims resolved for payment should be vacated.

## FACTUAL BACKGROUND

### I. The Endo Debtors' Bankruptcy Cases

Endo International plc and certain other entities (collectively, the "Debtors") commenced their cases on August 16, 2022. *See* Voluntary Petition, D.I. 1. The chapter 11 cases were jointly administered for procedural purposes pursuant to Fed. R. Bankr. P. 1015(b) and S.D.N.Y LBR 1015-1. *See* Order (I) Directing Joint Administration of the Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b); (II) Waiving the Requirements of Section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n); and Granting Related Relief, D.I. 45.

The Bankruptcy Court confirmed the Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo and its Affiliated Debtors (the "Plan") by Order entered on March 22, 2024, D.I. 3960 (the "Confirmation Order"). The Mesh Trust Agreement was an exhibit to the Plan. The Plan became effective on April 23, 2024 (the "Plan Effective Date"). *See* D.I. 4212.

On the Plan Effective Date, the Mesh Trust was formed pursuant to the Plan and the Confirmation Order. A fully executed copy of the Mesh Trust Agreement by and among Heather Barlow as the Trustee for the Mesh Trust and solely in her capacity as the Mesh Trustee and U.S. Bank National Association as the Delaware Trustee for the Mesh Trust was filed with the Bankruptcy Court on April 23, 2024. *See* D.I. 4213.

### II. The Mesh Trust

The express purpose of the Mesh Trust is "to exclusively handle all Mesh Claims held by claimants whose claims are channeled to the GUC Trust, to resolve and make distributions in

respect of Allowed Eligible Mesh Claims in accordance with this Mesh Trust Agreement, and use the Mesh Trust Assets (as defined herein) and income to meet its obligations . . . ." Mesh Trust Agreement § 2.2; *see also* Mesh Trust Agreement § 2.4 ("all Mesh Claims . . . shall be exclusively handled by the Mesh Trust.")

The Mesh Trust Agreement is explicit in its requirements including that "the Trust Submission Form shall include a HIPAA release form (the "HIPAA Release"), substantially in the form attached hereto as Exhibit 3." Mesh Trust Agreement § 4.1(b).

### III. The Mesh Claims Process and Mesh Claim Submission Form

The procedures for resolving Mesh Claims are set forth in the "Mesh Claims Process" (the "Claims Process") attached to the Mesh Trust Agreement. Among other things, the Claims Process provides:

> The Mesh Trust will receive, process, and resolve Eligible Mesh Claims in accordance with this Mesh Claims Process and determine whether they are Allowed and therefore eligible to receive payment from the Mesh Trust, or Disallowed and therefore not eligible for payment from the Mesh Trust. Allowed and Disallowed shall have the meanings ascribed to them in the Mesh Trust Agreement, provided that, for the avoidance of doubt, an Allowed Eligible Mesh Claim is ***an Eligible Mesh Claim that provides credible evidence that satisfies (as determined by the Mesh Trustee) the evidentiary criteria set forth below, including the delivery of a Trust Submission Form and all exhibits thereto***, and is otherwise eligible for an offer of payment in accordance with this Mesh Claims Process.

Claims Process § 2.1(a) (emphasis added).

Section 3.2.3 of the Claims Process makes clear that the Eligible Mesh Claimant must satisfy each one of a list of criteria including that they "complete, sign and submit the HIPAA Release, if applicable." Movants hang their entire argument on the single conditional adverbial phrase "if applicable" as overriding all of the explicit requirements of the Mesh Trust Agreement, the Claims Process, and the Trust Submission Form for Mesh Claims Process (the "Mesh Submission Form").

The Mesh Submission Form provides that:

> It is important for this Part Three that you have executed and submitted the HIPAA release form attached hereto to ensure the Mesh Trustee can access and review the medical records that support your claim.

*See* Mesh Submission Form pt. III, at 7. In addition, the Mesh Submission Form also informed claimants that failing to return a HIPAA Release would result in disallowance of their claim:

> It is important for this Part Three that you have executed and submitted the HIPAA release form attached hereto to ensure the Mesh Trustee can access and review the medical records that support your claim.

Mesh Submission Form, p. 7.

> I understand that authorizing the disclosure of this health information is voluntary. ***I can refuse to sign this authorization and forego a recovery under the Mesh Trust Agreement***.

Mesh Submission Form, Ex. 3, HIPAA Release, p. 13.

## IV. The Mesh Trustee's Powers and Discretion Under the Mesh Trust Agreement

The Mesh Trust Agreement makes clear that the Mesh Trustee has the power to "administer, resolve and satisfy all channeled Mesh Claims on behalf of the GUC Trust." Mesh Trust Agreement § 3.1(c)(i). As previously recognized by this Court, the Mesh Trustee has broad discretion in discharging her fiduciary duties to the Mesh Trust. *See* Memorandum Decision Sustaining Plan Administrator's Eighth Omnibus Objection to Certain Claims to be Reclassified D.I. 206 (internal citations omitted). As set forth therein:

> Pursuant to the Endo Mesh Trust Agreement, as part of her fiduciary duties, the Mesh Claims Trustee oversees the allowance or disallowance of Class 4(C) Mesh Claims. Under the agreement, the Mesh Claims Trustee has broad discretion as to both the process relating to, and the ultimate decision with respect to, allowance or disallowance of Class 4(C) Claims. The agreement does not require Court approval of the allowance or disallowance of Mesh Claims or the valuation of Mesh Claims.

Specifically, as relevant here, the Mesh Trustee had the discretion to conduct a deficiency process, providing all claimants who failed to timely submit required information or documents an opportunity to cure such failures. *See* Mesh Trust Agreement § 4.1(e):

> In the event that the GUC Trust receives a deficient Trust Submission Form from a holder of a Pending Mesh Claim, the Mesh Trust shall provide notice of such deficiencies to such holder at the Mesh Trustee's discretion. ***Unless such deficiencies are corrected within thirty (30) days of the Mesh Trust providing notice, such Claim shall be Disallowed for all purposes of the Mesh Trust***.

(emphasis added).[5]

## V. The Movants Have Been Represented by Counsel Since the Outset of These Cases

Only a few months after the commencement of these cases, counsel for Movants filed an entry of appearance. *See* Notice of Appearance. D.I. 1458. In the appearance, Mr. Magaliff asked for copies of all pleadings, motions, and applications to be served upon him at R3M Law, LLP. *See id*.

Counsel for the Movants took a very active role in the Debtors' cases. The Movants made clear that Mr. Magaliff and other counsel representing certain alleged Australian claimants including the Movants, were directly involved in negotiating, drafting, and finalizing the various forms and procedures for submitting claims to the Mesh Trust approved by this Court. *See* PI Motion ¶ 11 ("***The terms of the Mesh Trust Agreement and the administration of the Mesh Claims Trust were negotiated among the Committee, the Australian Mesh Claimants***, and several other parties in interest, and were ultimately approved by this Court.") (emphasis added).

Despite all of the time and effort devoted to reviewing the many pages devoted to Mesh Trust forms, procedures, directions, and other materials, the Movants rely on a single "if

[5] The deficiency deadline established by the Mesh Trust Agreement is analogous to a bar date and critical for finality so that the Mesh Trust could establish the universe of claims for purposes of review and valuation. *See* Argument I.B.2.a.

applicable" after one instance in which there was reference to the need to complete a HIPAA Release to override all other express terms of the Mesh Trust Agreement and Claims Submission Form, as well as the Mesh Trustee's discretion to make the determination of whether a HIPAA Release was applicable . *See* Trust Agreement § 4.1(e); Claims Process at 3.2.3.

**VI. The Movants' Failure to Take Timely Action to Satisfy or Seek to Modify the Requirements of the Mesh Trust Enforcing the Mesh Claims Process.**

Following the Effective Date, the deadline for submission of Mesh Claims was set for September 5, 2024. Less than two months before the original deadline, counsel for the Movants contacted the Mesh Trustee seeking waivers he admits he helped to negotiate. *See,* Correspondence from Howard P. Magaliff (July 18, 2024, at 10:11 p.m.) at 1 (alleging it would take up to a year and would cost over $12,775,000 to obtain and review the necessary records) (the "July 2024 Correspondence"). A copy of the July 2024 Correspondence is attached as Exhibit B to the Ramsey Dec.

On February 11, 2025, counsel for Movants received correspondence from the Mesh Trustee advising that various claims submitted were deficient for one or multiple reasons. *See* PI Motion at Exhibit 4, p. 3. On the same date, an access link to an excel spreadsheet showing each Mesh Claim submitted by Movants' counsel and any deficiencies that were identified in the submission as well as a document titled Deficiency Descriptions (the "Legend") was provided via separate correspondence.[6] A copy of the Legend is attached as Exhibit C to the Ramsey Dec.

The Legend accompanying the deficiency file explained the meaning behind the various designations used to show what was missing and included, among others:

DEFICIENCY CODE: REC
Mesh Trust Form

[6] The PI Motion includes only the initial email and does not include the follow up email with the Legend or the link to access the deficiency information.

> Part Three/Four: Implantation of an Eligible Debtor Product/Mesh Claimant Injuries
> You did not provide eligible identification and/or additional evidence (i.e. medical records) to establish that you were implanted with an Eligible Debtor Product and to demonstrate the treatment of one of the qualifying conditions, as required.
>
> DEFICIENCY CODE: HIP
> Mesh Trust Form
> Part Three: Implantation of an Eligible Debtor Product
> You did not submit a completed HIPAA Release Form (all sections are required to be completed except Questions 1 and 2, which are optional).[7]

Both of the Movants appear on the deficiency notice provided to their counsel, and both are identified as failing to submit an executed HIPAA Release.

Ultimately, through various communications delivered by the Movants' counsel and at the Mesh Trustee's discretion, all victims were afforded until March 20, 2025, to provide all necessary information and to cure all deficiencies which deficiencies had been set forth on a claimant-by-claimant basis by the Mesh Trustee in notices such as the one attached to the PI Motion at Exhibit 4. This thirty-seven-day (37) cure period (from February 11 to March 20, 2025) exceeded the cure period required pursuant to the Mesh Trust Agreement by a full week. *See* Trust Agreement at § 4.1(e) (providing that deficiencies are to be corrected within thirty (30) days of notice).

On March 19, 2025, the day prior to the final extended deadline, approximately 8 months since the first request for an extension, and approximately 6 weeks after the notice of deficiency was delivered to Movants' counsel which made clear that failure to include the HIPAA Release

---

[7] Movants argue that because the Mesh Trustee did not determine claims to be deficient because of a lack of an heirship declaration, that the Mesh Trustee is "cherry picking" which aspects of the Mesh Trust Agreement she is choosing to enforce. *See* PI Motion at para 30. Movants miss the point. The Mesh Trustee, recognizing that heirship declarations may be challenging to obtain because they rely on, among other things, wills, trusts, or intestate law, chose not to seek such declarations until after it was determined if a claim was resolved for payment. Afterall, if the claim was not resolved for payment, the heirship declaration would be unnecessary. This discretionary decision is not at all similar to reviewing and verifying sensitive medical information necessary to determine if a Mesh Claim would otherwise qualified for payment by the Mesh Trust in the first place. The Mesh Trust has not waived, and intends to enforce, the heirship declaration as needed.

would constitute a claim deficiency, counsel for the Movants advised counsel for the Mesh Trust that all deficiencies had been addressed except for inclusion of the HIPAA Release. *See* Email from Howard P. Magaliff to Natalie D. Ramsey (Mar. 19, 2025, 1:54 p.m.), PI Motion Ex. 5 at p. 1 ("We did not supply HIPPA (sic) forms for the Australian claimants because they are not subject to it and have no idea even what HIPPA (sic) is.").

Less than 30 minutes after receiving the aforementioned correspondence from counsel to Movants, the Mesh Trust reiterated yet again that "[t]he Trust has been very clear throughout that each and every document subject to a deficiency notice must be submitted by the deadline of March 20, 2025. ***Without a completed HIPPA [sic] form, the claims will be considered deficient and will be disallowed***." *See* Correspondence from Natalie D. Ramsey to Howard P. Magaliff (Mar. 19, 2025, 2:20 p.m.), P.I. Motion Ex. 5 at p. 1 (emphasis added). Movants permitted the deadline to expire without further action. Because Movants failed to cure their claim deficiencies, their claims were automatically disallowed under the express language of the Mesh Trust. *See* Trust Agreement § 4.1(e):

> In the event that the GUC Trust receives a deficient Trust Submission Form from a holder of a Pending Mesh Claim, the Mesh Trust shall provide notice of such deficiencies to such holder at the Mesh Trustee's discretion. ***Unless such deficiencies are corrected within thirty (30) days of the Mesh Trust providing notice, such Claim shall be Disallowed for all purposes of the Mesh Trust.***

(emphasis added)[8].

[8] Generally, in response to the deficiency process, multiple deficiencies were cured by Mesh Trust claimants. Importantly, other foreign claimants, including other Australian claimants not represented by Movants' counsel, submitted an executed HIPAA Release, either as part of their initial submission or in response to the deficiency notice.

## VII. Movants Sought and Withdrew a Request for Class Certification with Prejudice

The Australian Claimants filed a motion seeking class certification in the Debtors' cases. *See* Motion of Jodie Philipsen and Janice Seymour for Order (I) Certifying the Class of Australian Mesh Claimants and Authorizing the Filing of a Class Proof of Claim, or Alternatively, (II) Extending the Bar Date to File Proofs of Claim at D.I. 2138 (the "Certification Motion"). Among the relief requested, the Certification Motion asked that "the Lead Plaintiffs (as defined in the Certification Motion) are appointed as class representatives for the Mesh Claimants." *See* Form of Order Accompanying Certification Motion ¶ 4.

The Certification Motion was opposed by the Debtors, the Official Creditors' Committee, and the Official Committee of Opioid Claimants. *See* D.I. 2226, 2227, and 2228. A stipulation was then entered and filed with this Court which, among other things, permitted the claimants to file a group proof of claim, but providing that the Certification Motion would be withdrawn with prejudice. ("The Movants will withdraw the [Certification] Motion ***with prejudice***.") (emphasis added); s*ee* Stipulation by and Among Jodie Philipsen and Janice Seymour, the Official Committee of Unsecured Creditors, the Official Committee of Opioid Claimants, and the Debtors Resolving the Class Claim Motion at D.I. 2242 ¶ 4 (the "Certification Stipulation"). A notice of withdrawal was then filed by the movants withdrawing the Certification Motion ***with prejudice***. D.I. 2246 (the "Withdrawal of Class Certification with Prejudice") (emphasis added).

## VIII. The Complaint and the Amended Complaint

The complaint commencing this adversary proceeding was filed by the Movants on June 2, 2026. Adv. D.I. 1 (the "Original Complaint"). On June 9, 2026, counsel for the Mesh Trustee advised the Movants that the Original Complaint was procedurally improper. *See* Correspondence from Natalie D. Ramsey to Howard P. Magaliff dated June 9, 2026 attached as Exhibit D to the Ramsey Dec. (the "6.9 Letter"). Among other things, the 6.9 Letter advised that

pursuant to § 4.8.1 of the Mesh Trust Agreement, under certain circumstances an individual may file a lawsuit in state or federal court of the United States "against the Mesh Trust" and that such suit "must be filed by the Eligible Mesh Claimant in her (sic) or her own right and name, and not as a member or representative of a class." The 6.9 Letter further noted that pursuant to that same section of the Mesh Trust Agreement "no such lawsuit may be consolidated with any other lawsuit and may only name the Mesh Trust as a defendant." 6.9 Letter at p. 1.

The 6.9 Letter identified not only the procedural irregularities of the Movants' papers but also noted the myriad substantive issues with their filings. In response, the Movants filed an amended version of the Complaint which continued to name Ms. Barlow in her capacity as Mesh Trustee but also added each of the Mesh Trust and the Delaware Trustee. *See* Adv. D.I. 4 (the "Amended Complaint"). The Amended Complaint continues to seek relief on behalf of more than one claimant and continues to seek to pursue a complaint as a class without appropriate certification of the class or authority of the Movants to serve as class representatives. Movants' counsel responded that it would be expensive and inefficient to proceed as required. Correspondence from Howard P. Magaliff to Natalie D. Ramsey dated June 12, 2026 attached as Exhibit E to the Ramsey Dec.

Neither the Complaint nor the Amended Complaint have been served on the Mesh Trustee or the Mesh Trust to date.

## ARGUMENT

### The Movants Fail to Satisfy the Requirements for Entry of a Preliminary Injunction

A preliminary injunction seeks extraordinary relief, requiring the movant to meet a high burden of proof with regard to four specific elements.[9] A party seeking a preliminary injunction

[9] A Motion for a temporary restraining order carries the same burden. *See 3M Co. v. CovCare, Inc.*, No. 21-CV-01644 (DG) (JRC), 2021 WL 7162292, at *2 (E.D.N.Y. Apr. 7, 2021) (stating that "In this [c]ircuit, 'the standard

must demonstrate:

> (1) "a likelihood of success on the merits or ... sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (omission in original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)); s*ee In re Homaidan v. Sallie Mae, Inc. (In re Homaidan)*, 650 B.R. 372, 406 (Bankr. E.D.N.Y. 2022).

A. The Movants Cannot Demonstrate Irreparable Harm.

This Court need not proceed beyond the irreparable harm inquiry in the instant case. The showing of irreparable injury is "the most important prerequisite for the issuance of a preliminary injunction." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995) (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir 1990)); s*ee In re Homaidan*, 650 B.R. at 406.

The irreparable harm must be more than speculative or remote. To succeed on an application for a preliminary injunction, the moving party must generally show that, "on the facts of their case, the failure to issue an injunction would actually cause [them] irreparable harm." *Salinger*, 607 F.3d at 82.

Each of the Movants' claims was Disallowed for all purposes. Because the Movants do not hold claims that are eligible for distribution, distribution to the holders of Allowed Mesh Claims has and can have no impact on them at all, let alone irreparable harm.

Movants' conscious decision to ignore a deficiency notice and then delay fifteen (15) months after Disallowance of their claims to seek retroactive relief from this Court, constitutes

---

for an entry of a temporary restraining order is the same as for a preliminary injunction.'") (alteration omitted) (quoting *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008)).

laches. The "harm" which they allege is the disallowance of their claims, which occurred well over a year ago. Movants' delay is fatal to their claim of immediate and irreparable harm which in turn should result in their request for a preliminary injunction being denied and the Temporary Restraining Order previously entered vacated.

Should the Court consider the remaining elements, Movants fare no better. Movants: (i) cannot show a likelihood of success on the merits, (ii) cannot prove that the balance of hardship tips in their favor, and (iii) cannot show that the requested injunction would serve the public interest.

A "party seeking injunctive relief 'need only show a likelihood of success on the merits of at least one of its claims.'" *3M Co.*, 2021 WL 7162292, at *2 (quoting *Home It, Inc. v. Wen*, No. 19-CV-7070 (MKB) (VMS), 2020 WL 353098, at *5 (E.D.N.Y. Jan. 21, 2020)). "[A] plaintiff 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent.'" *Home It, Inc.*, 2020 WL 353098, at *5 (quoting *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018)); s*ee In re Homaidan*, 650 B.R. at 406.

As to the balance of hardships, "a court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 262 (N.D.N.Y. 2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S 7, 24 (2008). The party moving for a preliminary injunction "must establish that the 'balance of hardships tips in their favor regardless of the likelihood of success.'" *Main St.*, 103 F. Supp. 3d at 262 (citing *Salinger*, 607 F.3d at 79-80). In this context, "[t]he relevant harm is the harm that ... occurs to the parties' legal interests" and "cannot be remedied after a final adjudication, whether by damages or a

permanent injunction." *Salinger*, 607 F.3d at 81 (footnote omitted); s*ee In re Homaidan*, 650 B.R. at 407.

Finally, as to the question of the public interest, "[i]n considering the public interest element for granting an injunction, the focus is generally on how the parties' specific actions would impact the public at large." *Roman Catholic Diocese of Syracuse, N.Y. v. LG 35 Doe* (*In re Roman Catholic Diocese of Syracuse, N.Y.*), 628 B.R. 571, 582 (Bankr. N.D.N.Y. 2021) (citing *Winter*, 555 U.S. at 13-14). "Courts have long recognized that public interest is a 'supple principle' with 'as many and as variegated applications ... as the situations that have brought it into play.'" *In re Roman Catholic Diocese*, 628 B.R. at 583 (omission in original) (quoting *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500, (1941)); s*ee In re Homaidan*, 650 B.R. at 407.

B. The Movants Cannot Demonstrate a Likelihood of Success on the Merits

1. *Procedural Deficiencies Prevent Prosecution of the Amended Complaint*

The Amended Complaint and PI Motion are procedurally improper under the explicit terms of the trust documents which prohibit challenges to the Mesh Trust claims process by multiple movants in a single complaint. Even if the Mesh Trust did not include that limitation, the Movants cannot seek certification of a class given their prior decision to withdraw their Certification Motion with prejudice.

Section 4.8.1 of the Mesh Claims Process makes clear that a lawsuit filed "must be in her or her (sic) own right and name, and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit." Accordingly, there can be no class certified here as each claimant must move on their own. Movants, who claim to have been in the room where it happened when these procedures were finalized, apparently did not seek any modification of this requirement and should not be granted relief from the explicit language of the Mesh Trust Agreement.

*Assuming arguendo* class certification could be possible under the Mesh Trust Agreement (which it is not), the Movants themselves withdrew their prior request to be certified as a class ***with prejudice***. The doctrine of *res judicata* applies here to prevent the Movants from reviving this request.[10]

''A voluntary dismissal with prejudice is an adjudication on the merits for purposes of *res judicata*.'' *Chase Manhattan Bank, N.A.. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995) (citing *Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir.1986)); *see also Mohamad v. Rajoub*, 767 F. App'x 91, 92 (2d Cir. 2019) (''Because Plaintiffs voluntarily dismissed their claims against [the defendant] in [an earlier action filed in 2005 in the district court] with prejudice and because '[a] voluntary dismissal with prejudice is an adjudication on the merits for purposes of *res judicata*,' . . . we easily conclude that the first factor is met . . . .''). A ''notice of voluntary dismissal 'operates as an adjudication on the merits'—and may therefore trigger *res judicata*—if 'the plaintiff previously dismissed any federal or state-court action based on or including the same claim.''' *ICICI Bank Ltd., .N.Y. Branch v. Doshi*, No. 19-CV-11788-LTS-SLC, 2024 WL 1242531, at *3 (S.D.N.Y. Mar. 22, 2024).

Movants agreed as part of the Certification Stipulation that the request for class certification would be withdrawn with prejudice which withdrawal was reflected in the Withdrawal with Prejudice. *See* Certification Stipulation and Withdrawal with Prejudice. A stipulation agreeing to withdrawal with prejudice of the request for class certification is a final

[10] Given the Movants have failed to provide a scintilla of briefing as to the reason why they should be certified as a class in the Original Complaint, the Amended Complaint, or the PI Motion, the Mesh Trust and Mesh Trustee will not devote the Mesh Trust's limited resources to arguing why such relief should be denied at this time apart from the procedural ground of *res judicata*. In the event this Objection to the PI Motion is not sustained and this Court orders briefing on appointment of a class in this matter, the Mesh Trust and the Mesh Trustee ask for a reasonable amount of time to respond to such papers once they are filed and served by the Movants. However, as set forth herein, it is believed that such an exercise is unnecessary and unwarranted as the Court need not reach that question to deny the PI Motion.

adjudication on the merits. *See Chase Manhattan Bank*, 56 F.3d at 345; *see also Vega v. State Univ. of N.Y. Bd. of Trs.*, 67 F. Supp. 2d 324, 334 (S.D.N.Y. 1999) ("Generally, a stipulation of dismissal with prejudice 'is deemed a final adjudication on the merits for res judicata purposes on the claims asserted or which could have been asserted' in the prior action.'') (quoting *Israel v. Carpenter*, 120 F.3d 361, 365 (2d Cir.1997), *cert. denied*, 522 U.S. 1114, 118 S. Ct. 1049, 140 L. Ed. 2d 113 (1998)).[11]

Accordingly, pursuant to the doctrine of *res judicata*, Movants voluntarily relinquished their right to be treated with all other individuals represented by the same counsel as a class and are barred from doing so now.

Because of the procedural defects in commencing the adversary, the Amended Complaint should be dismissed. Therefore, Movants cannot demonstrate a likelihood of success on the merits.

2. *The Movants Fail to Assert a Legally Sufficient Basis for Retroactive Reinstatement of Their Disallowed Claims*

Apart from the procedural infirmities suffered by the Movants' papers, the Movants cannot demonstrate a likelihood of success on the substance of the allegations in the Amended Complaint.

a. The Movants' Claims Were Disallowed by the Self-Executing Terms of the Mesh Trust Agreement When They Elected to not Provide a HIPAA Release in Response to a Deficiency Notice

The Mesh Trust Agreement and related procedures and forms were each heavily negotiated and approved by this Court after years of chapter 11 proceedings. Once the Mesh Trustee exercised her discretion to provide the Movants with a deficiency notice and opportunity to cure,

[11] Arguing that the withdrawal with prejudice of the Motion for Certification had unintended consequences does not save the Movants. "A stipulation will (almost invariably) have preclusive effect notwithstanding a litigant's *post hoc* assertion that he intended to preserve certain claims." *Id*. Thus, a party will ordinarily not be relieved from the preclusive effect of a stipulation because his counsel failed to evaluate carefully its *res judicata* effect. *Id*. (citing *Nemaizer*, 793 F.2d at 62–63). By filing and withdrawing the Certification Motion with prejudice, Movants are barred from seeking any form of class certification again – whether in the main case or an ancillary case such as the instant adversary.

and the cure period expired, the clear and unambiguous terms of the Mesh Trust resulted in the immediate Disallowance of Movants' claims (and the claims of every other individual who did not cure a noticed deficiency). Section 4.1(e) of the Mesh Trust Agreement is self-executing and absolute.

The deficiency notice created the equivalent of a bar date. Such bar dates, including in post-confirmation claims procedures, are routinely enforced to achieve the dual goals of finality and fairness. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 566 B.R. 353, 357–58, 366–67 (S.D.N.Y. 2017) (affirming the expungement of thousands of claims because the claims representative failed to comply with a mandatory claims-resolution protocol and ***missed the protocol's submission deadlines***, emphasizing that compliance with claims-processing procedures was required to preserve claims) (emphasis added); *see also In re W.R. Grace & Co.*, 563 B.R. 150 (Bankr. D. Del. 2016) (concluding that a claim that missed the bar date was not the result of excusable neglect when the claimant had actual notice of the bar date and knew that claims "were to be filed or lost"); *In re Enron Corp.*, 419 F.3d 115, 134 (2d Cir. 2005) (affirming the denial of a late-filed claim submitted six months after the bar date and emphasizing that "the purpose of a bar date has to be given great deference" because allowing untimely claims threatens the orderly administration and finality of the reorganization process); *In re XO Commc'ns, Inc.*, 301 B.R. 782, 796–98 (Bankr. S.D.N.Y. 2003) (expunging a late-filed claim and rejecting excusable neglect where the delay was within the claimant's control and permitting the untimely claim could unnecessarily delay case administration, notwithstanding the relative insubstantiality of the claim); *In re Au Coton, Inc.*, 171 B.R. 16, 17–18 (S.D.N.Y. 1994) (affirming the disallowance of a proof of claim filed eighteen days after the bar date because counsel's inadvertence and carelessness in missing the deadline did not constitute excusable neglect); *In re Trump Taj Mahal Assoc.*, 156 B.R. 928 (Bankr. D. N.J.

1993) (denying a request to file a proof of claim out of time because claimant had notice of the bar date, the claims that were filed a year after confirmation would prejudice the debtor, and the alleged claimants caused the delay).

b. The Terms of the Mesh Trust Agreement are not Ambiguous

Movants' effort to claim an ambiguity in the Mesh Claims Process to excuse not only their non-compliance but their inaction fails. Even if this Court accepts the representation that Movants' counsel added "if applicable" to the requirement of a HIPAA Release in a single location to avoid the application of that requirement to his clients, contract law requires interpretation of the Mesh Trust Agreement as a whole.

Delaware law governs the construction of the Mesh Trust Agreement. *See* Mesh Trust Agreement § 7.13. It is fundamental that whether a contract is ambiguous is a question of law. *See Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 164* (3d Cir. 2001) ("The determination whether a contract term is ambiguous is a question of law . . . .). "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Fiberlink Communications Corporation v. Digital Island, Inc.*, No. 01-2666, 2002 WL 1608235 at 1 n 3 (E.D. Pa. July 18, 2002) (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (citations omitted). "To determine whether ambiguity exists in a contract, the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" *Id.* at 93 (citation omitted).

Under Delaware law, one must read specific language in the context of the document as a whole. *See New Castle Cnty v. Nat'l Union Fire Inc. Co. of Pittsburgh, Pa.*, 174 F.3d. 338, 349

(3d Cir. 1999) (citing *Cheseroni v. Nationwide Mut. Inc. Co.*, 402 A2d 1215, 1217 (Del. Super. Ct. 1979), aff'd 410 A.2d 1015 (Del. 1980) ("[A] single clause or paragraph of a contract cannot be read in isolation, but must be read in context, and every portion of the contract deserves consideration."). A court takes care not to render other portions of a provision or contract superfluous when construing contract language. *Id*. at 349 (citations omitted). The Second Circuit embraces the Third Circuit's view of interpretation that a portion of a contract cannot make other provisions superfluous. *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("A contract should be construed to give full meaning and effect to all provisions, and courts should avoid interpretations that render contractual language meaningless) (citations omitted).

Movants improperly ask this Court to read the underlying trust documents in a way that would require this Court to ignore multiple specific provisions of the Mesh Trust Agreement and elevate a single conditional phrase over all else. This Court should deny such an invitation as in contravention to the law of contract interpretation.

c. Movants' Arguments Regarding the Applicability a HIPAA Release to Australian Claimants Are Irrelevant and Would Result in the Mesh Trust Having no Evidence of Individual Consent by Claimants to Receipt, Review, and Verification of Their Private Medical Records

The Movants devote multiple pages of their PI Motion and provide a Declaration from Simon Morrison (Movants' Australian counsel) on the issue of whether the HIPAA Release (or HIPAA generally) applies when documents are provided from outside of the United States in an effort to justify their strategic decision not to supply a HIPAA Release.[12] This argument is

[12] Apart from some general citation to law that HIPAA does not apply in other countries, Movants fail to cite to any cases on the applicability of HIPAA when non-US entities provide medical documents to entities within the United States. In fact, there is secondary authority to the point that records of foreigners provided to the United States may indeed be covered by HIPAA. *See* Long Distance Records: Requesting and Managing Records of Foreign Nationals ("Records received from a foreign provider are considered part of the domestic provider's designated record set, as defined in the HIPAA privacy rule, if they are used to make decisions about patient care.")

irrelevant.

*Assuming arguendo* that the Movants made a good faith decision that the "if applicable" language in section 3.2.3 modified all other provisions of the Mesh Claims Process and the Mesh Trust Agreement and made the HIPAA Release obsolete to foreign claimants, the ultimate decision of whether the form was required was for the Mesh Trust to make.

The Mesh Trustee made a fiduciary decision to ensure that every Mesh Claimant had provided consent to the Mesh Trust so that it could freely review provided information, collect additional medical information, and/or verify medical information provided by claimants. The Mesh Trust made the decision to require the form of HIPAA Release attached to the Mesh Claims Process to ensure that claimants' medical privacy was respected.

As regards the Movants (and in particular the others they purport to represent), it was and remains unclear whether they are even aware that their sensitive medical information is being provided to parties thousands of miles outside of Australia. *See, e.g.* Exhibit 2 of Original Complaint, Declaration of Simon Morrison ¶ 36 ("Personal information including medical records was provided to the Mesh Trustee by Shine Lawyers on behalf of the Plaintiffs and the Australian Mesh Claimants. ***This disclosure was either: expressly or impliedly consented to*** by the Australian Mesh Claimants.") (emphasis added).[13] Accordingly, by their own admission, Movants' counsel may have provided sensitive medical information to the Mesh Trust without getting the explicit permission of any particular claimant to do so. The Mesh Trust reasonably sought to ensure individual claimant consent to access their private medical data.

---

https://journal.ahima.org/Portals/0/archives/AHIMA%20files/Long%20Distance%20Records_%20Requesting%20and%20Managing%20the%20Records%20of%20Foreign%20Nationals.pdf. Last accessed on June 15, 2026

[13] The exhibits attached to the Original Complaint were not attached to the Amended Complaint.

d. The Movants Unreasonably Failed to Take Timely Action to Satisfy or Challenge the Mesh Trust's Requirements Despite Early and Repeat Notice of the Mesh Trust's Position Requiring an Executed HIPAA Release

The Mesh Trustee exercised the discretion provided by the Court-approved governing documents to provide a consistent and fair process applicable to all those asserting Mesh Claims. Movants were provided with notice, formally and informally, of the Mesh Trust's requirements. As early as May 6, 2024, Movants' counsel was told by counsel for the Mesh Trust that the Trust would enforce all of the requirements set out in the Mesh Claims Process. *See*, Correspondence from Natalie D. Ramsey to Howard P. Magaliff (May 8, 2024) attached as Exhibit F to the Ramsey Dec. (providing that "[W]e are not in a position to adjust the deadline or claim requirements.")

Periodically thereafter the Mesh Trust reiterated that position to Movants' counsel—the Mesh Trust never veered from this position. Movants took ***no action*** to seek relief in this or any other court to address their disagreement with the need to provide a HIPAA Release.

If there was a time when the applicability of HIPAA was to be addressed by the Movants, it was: (i) in the years they spent actively participating in these cases and negotiating the documents where explicit language regarding the applicability of the HIPAA Release could have been added; (ii) in May, 2024 when it was made clear that the claim requirements would not be adjusted; (iii) in February, 2025 when the Mesh Trustee provided claim-by-claim notices of deficiencies (including lack of a HIPAA Release); (iv) when counsel to the Movants threatened to take action with this Court in connection with the process for reviewing claims as noted in Exhibit 4 at pp 1-2 of the PI Motion; (v) upon delivery of the March 19, 2025 correspondence from counsel to the Mesh Trust advising that the HIPAA Release was a required document that must be included with a claim submission; or (vi) at the very latest (and without concession that under these facts such action would have been successful), within a reasonable time after March 20, 2025 when the plain

language of the documents governing the Mesh Trust caused Movants' asserted Mesh Claims to be Disallowed.

The Movants cannot demonstrate a likelihood of success on the merits.

C. In Balancing Relative Hardship of the Parties, the Mesh Claimants Who Timely Complied with the Mesh Claims Process and the Mesh Trust Would Suffer Significant Hardship by Granting the PI Motion, Whereas any Possible Hardship to the Movants Occurred Long Ago

The second and third factors of the traditional standards governing preliminary injunctions are "whether the [movant] will suffer irreparable injury without the injunction and the harm to others which will occur if the injunction is granted." *W.R. Grace & Co v Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 33 (Bankr. D. De. 2008). These two factors determine "the relative hardship of the parties." *Id.* (citing *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir. 2007). Accordingly, the Court will compare the potential irreparable harm the Movants will suffer without the injunction against the potential harm to the Mesh Trust if the injunction is granted.

As discussed above, any irreparable injury occurred over a year ago and was the direct result of the Movants' decision not to follow the requirements of the Mesh Trust. Having failed to do so, the Movants do not hold claims against the Mesh Trust. Because they hold no rights against the Mesh Trust, they cannot be harmed by any further action taken by the Mesh Trust. Furthermore, their extraordinary delay does not support their request for equitable relief.

Even if the Movants had a colorable argument for retroactive relief after significant delay, which they do not, the injury to the Mesh Trust itself would be significant. The Mesh Trust would be required to revisit the process for any claimant whose claim was Disallowed for failure to provide a HIPAA Release (and arguably every claimant who had any other deficiency resulting in their claim being Disallowed as of March 20, 2025). The Mesh Trust would have to belatedly start the cure process yet again.

The balance of hardships supports denial of the Motion.

D. Public Interest Requires Denial of the PI Motion

Public interest "is a somewhat nebulous factor to be considered in determining whether an injunction should issue in bankruptcy cases." *In re W.R. Grace*, 386 B.R. at 36. Here, however, the public interest in fairness and finality strongly weigh against the Movants' position.

As discussed above, there is a strong public interest in ensuring that claims resolution procedures are applied equally among all claimants. The Movants are seeking to be treated differently from every other claimant—many of whom were not located in the United States—and who followed the rules approved by this Court for holders of Mesh Claims to submit those claims to the Mesh Trust.

There is also a strong public interest in finality in bankruptcy cases. The Movants seek to roll back the clock and challenge decisions made years ago after the expenditure of significant time and effort to conduct a fair claims process. The process engaged in by the Mesh Trust afforded multiple opportunities for the Movants to comply with or timely seek to modify the requirements imposed by the Mesh Trust. The Mesh Trust specifically provided notice to the Movants that their claims were deficient, and the Movants knowingly failed to cure that deficiency.

Furthermore, the relief the Movants seek would hold the compliant claimants hostage to the disallowed ones. The Mesh Claims that Movants' counsel submitted vastly outnumber the claimants who satisfied the Mesh Trust's requirements and remain eligible for distribution. The Movants do not ask the Court merely to preserve their own contingent recovery; they ask it to enjoin all distributions to the comparatively small group of claimants who complied with the Court-approved process and submitted complete claims by the deadline. No reserve or holdback can cure this. Because the disallowed claims so substantially outnumber the entire pool of

compliant claims, any reserve sized to the Movants' asserted claims would itself consume the Mesh Trust's assets and freeze distributions to the compliant claimants. The only way to protect the claimants who followed the rules is to deny the injunction and permit distributions to proceed to claimants with claims resolved for payment. The potential additional delay and dilution of the remaining trust assets would cause the compliant claimants irreparable harm.

It is a fundamental tenet of law that justice delayed is justice denied. The holders of Mesh Claims who followed the Court-approved process have been waiting years to have their claims resolved. They should not be further delayed because the Movants and their counsel chose to ignore the explicit requirements of submission to the Mesh Trust that they allegedly helped to draft especially given the various notices and opportunity to cure they were provided.

Public interest weighs in favor of denying the PI Motion.

## CONCLUSION

For the reasons set forth herein, (i) the PI Motion should be denied; (ii) the TRO Order should be vacated; and (iii) this Court should grant such other and further relief as is just and proper.

**[SIGNATURE PAGE FOLLOWS]**

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

Dated: June 23, 2026
New York, New York

**ROBINSON + COLE, LLP**

*/s/ Natalie D. Ramsey*
Natalie D. Ramsey
Mark A. Fink
666 Third Avenue, 20th Floor
New York, New York 10017
212-451-2900 (phone)
212-451-2999 (facsimile)
Email: nramsey@rc.com
mfink@rc.com

*Counsel to Heather Barlow in her capacity as the Trustee of the Endo Mesh Trust*